# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Sidney I. Schenkier | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 03 C 802 | DATE | 1/26/2004 |
| CASE TITLE | | Bryant vs. Barnhart | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. For the reasons set forth in the attached Memorandum Opinion and Order, the plaintiff's motion for summary judgment (doc. # 17) is GRANTED and defendant's motion for summary judgment (doc. # 23) is DENIED. This case is remanded, pursuant to sentence 4, 42 U.S.C. § 405(g), for further administrative proceedings consistent with this opinion.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | |
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | date docketed | 30 |
| | Notified counsel by telephone. | | | |
| ✓ | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | | |
| | Copy to judge/magistrate judge. | '04 JAN 26 PM 3:31 | date mailed notice | |
| mm | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| CHRISTOPHER BRYANT, ) <br> a minor, by his mother and next friend, ) <br> Catherine Bryant, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> JO ANNE B. BARNHART, ) <br> Commissioner of the Social Security ) <br> Administration, ) <br> ) <br> Defendant. ) | No. 03 C 0802 <br> Magistrate Judge Schenkier |

## MEMORANDUM OPINION AND ORDER[1]

On May 8, 2001, Catherine Bryant applied for Childhood Supplemental Security Income on behalf of her son, Christopher Bryant, who currently is fifteen years old. The application was denied both originally and upon reconsideration. The claimant then requested, and was granted, a hearing before an Administrative Law Judge ("ALJ"), which was held in Chicago on June 17, 2002. Christopher was represented by counsel at the hearing; both Christopher and his mother attended and testified. The ALJ was presented with the question of whether Christopher was eligible, under 42 U.S.C. § 1614(a)(3) of the Social Security Act ("the Act"), to receive Supplemental Security Income ("SSI") payments as a disabled individual who has not yet attained age eighteen. The ALJ issued a written decision, dated August 28, 2002, denying SSI benefits to Christopher (R. 12-20). The ALJ found that Christopher had "no impairment that results in marked and severe functional limitations," and therefore found that Christopher did not have a disability within the meaning of the Act (R. 14).

---

[1] By consent of the parties and pursuant to 28 U.S.C. § 636(c), the case has been assigned to this Court for all proceedings, including the entry of final judgment (doc. ## 11-13).



Christopher filed a request for review on October 23, 2002 (R. 10); on December 6, 2002, the Appeals Council denied the request (R. 8-9). Therefore, the decision of the ALJ is the final decision of the Commissioner and is subject to judicial review by the district court. *See Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994).

Christopher subsequently filed a timely complaint in federal court pursuant to 42 U.S.C. §§ 405(g) and 1383(c), seeking judicial review of the final decision denying benefits. Both Christopher (doc. # 17) and the Commissioner (doc. # 23) have moved for summary judgment. For the reasons that follow, we deny the Commissioner's motion for summary judgment seeking affirmance of the denial of benefits; we grant Christopher's motion for summary judgment seeking reversal of the final decision; and we deny Christopher's request for an award of SSI benefits, and instead grant Christopher's alternative request for a remand for further proceedings.

I.

We begin with a summary of the record. Christopher Bryant was born on September 30, 1988, and is currently fifteen years old (R. 65). Christopher suffers from a learning disability and impaired eyesight (R. 68, 70, 75, 82).

Christopher suffered a retinal detachment in his left eye in September 1993, when he was about five years old (R. 131). Despite undergoing a surgery for the retinal detachment in December 1993, that condition has left Christopher without sight in his left eye (R. 131). The loss of sight in that eye is permanent (R. 127, 132).

In addition, since March 1996, Christopher has suffered from lattice[2] degeneration in his right eye (R. 131). In July 2001, Christopher underwent a surgical procedure to "prophylactically treat the lattice degeneration in his right eye" (R.256). The notes of the operative report state that "scattered areas of cystoid degeneration ... were noted near the ora, as well as meridional fold," and that "[a]n area of 'snail-track' lattice degeneration was noted superiotemporally" (R. 257). The surgical procedure involved the use of laser technology to "wall off the area of lattice at approximately 11 o'clock in the periphery" (*Id.*).

There is medical evidence in the record, dating back to the mid-1990's, concerning the effects of these conditions on Christopher's ability to see. A report by Dr. Ron Kurtz, dated May 2, 1995, reported that Christopher had corrected vision in his right eye of 20/30, had no abnormality or limitation in field of vision in his right eye, and that prolonged or occasional reading would not further impair his vision functioning (R. 116-117). This assessment of Christopher's vision was prior to the first diagnosis of the degenerative lattice condition in his right eye.

On August 20, 1996, Dr. J. Geiser prepared a report that noted that Christopher suffered from lattice retinal degeneration in his right eye, stating March 1996 as the onset date of that condition (R. 131). This report assessed Christopher has having corrected vision of 20/50, but continued to indicate no abnormality or limitation in his field of vision and no further impairment in his vision that would result from prolonged or occasional reading (R. 131-32).

On November 4, 1996, David Hillman examined Christopher and assessed his vision (R. 133-34). Dr. Hillman's report showed a corrected vision of 20/40 (R. 133). Dr. Hillman also

---

[2]The term "lattice" (lat'is) is descriptive; it means "a regular arrangement of units into an array such that a plane passing through two units of a particular type or in a particular interrelationship will pass through an indefinite number of units; *e.g.*, the atom arrangement in a crystal. *Stedman's Medical Dictionary* at 32 (27[th] ed. 2000).

3

indicated that Christopher's arc perimetry in his right eye was nasally 10 degrees, temporally 85 degrees, superiorly ten degrees and inferiorly 15 degrees, readings that Dr. Hillman indicated "may not be very reliable due to the claimant's age" (R. 133).

There is a more recent medical record, dated April 12, 2002, stating that Christopher has corrected vision of 20/30 in his right eye (R. 255). However, the parties have not identified (and we have not found) medical evidence in the record that assesses the effect of the lattice degeneration surgery on Christopher's right eye between the date of the surgery on July 18, 2001 and the date of the administrative hearing in this case eleven months later, on June 17, 2002. There was testimony that Christopher has difficulty in seeing small print, and must read large print books (R. 30, 43). Even so, he experiences pain in his eyes when reading for too long; consequently, he must take a break every hour or so and put his head down on a desk to rest for about thirty minutes (R. 30, 43). However, there is testimony by Christopher that, despite these problems with his vision, he is able to ride a bicycle and participate in sports (R. 33-34, 39-40, 44-45, 48), to assemble model cars (R. 39), and to play video games (R. 39).

Christopher also suffers from learning disabilities (R. 68, 70, 75, 82). As a result, he has been placed in several special education programs during his time in school (R. 12). Psychological tests revealed many mental normalities but also some abnormalities (R. 118-19; 127-30; 235-39). In June 2001, Christopher was found to have a "low average" general cognitive ability, with IQ scores running in the 80's (R. 239). However, this same assessment found that Christopher had "poor mental control," as exhibited by his inability to recall digits in reverse order (R. 235). The record shows that Christopher often needed extra time to finish his school assignments, particularly in mathematics (R. 30, 60). An individualized education program ("IEP") plan, dated December

2001, reported that Christopher's mother expressed concern that Christopher was having problems with his "eye aching" (R. 260). Christopher had to repeat grade levels on two occasions (R. 200). He was promoted from sixth grade to seventh grade based on age, and not his performance academically (R. 29). As of December 2001, Christopher was performing below expectancy in math application, reading, spelling, reading comprehension and math computation (R. 265). The IEP report stated that Christopher had difficulty with math reasoning, putting his ideas on paper, following multiple verbal requests and copying from the board, and that he processed information and recalled previously mastered facts slowly (R. 268).

As part of the IEP plan, Christopher was scheduled to be placed in a special education setting for math, reading, science and social sciences, comprising 1,255 minutes out of the 1,500 minute instructional week; Christopher was placed in general education only for music, physical education, health and safety, library, art and mentoring assemblies (R. 264). In addition, under the IEP plan, Christopher would be accommodated by, among other things, being tested on only one concept at a time; having someone check on his work progress every 15 minutes during class; and extending time for Christopher to complete class and homework assignments (R. 263).

## II.

In his decision, the ALJ found that Christopher suffered from severe impairments – the absence of vision in his left eye and a learning disability – which "caused more than minimal limitations in age-appropriate functions" (R. 15). The ALJ also found that Christopher has not engaged in "substantial gainful activity" (R. 15). The ALJ next considered whether the evidence showed that Christopher's impairments met, medically equaled, or functionally equaled listed

impairments (R. 15). Relying on reports of state agency psychologists and doctors, the ALJ found that Christopher's impairments did not meet or medically equal any listing.

The ALJ then addressed the question of whether Christopher's impairments were functionally equivalent to the limitations found in any listed impairment. The ALJ considered the six domains of functioning used to determine functional equivalence under 20 C.F.R. § 416.926(a): (1) acquiring and using information; (2) attending to and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) ability to care for himself or herself; and (6) health and physical well-being. An "extreme" limitation in any one of those domains, or "marked limitations" in any two of those domains, will satisfy the test of functional equivalence. Citing evidence of Christopher's subpar academic performance at school and the evaluative report finding that he had a low to average range of intelligence and particular difficulty in putting his thoughts into words, the ALJ found that Christopher had a marked limitation in the domain of acquiring and using information.[3] However, the ALJ found that Christopher did not have marked or extreme limitations in any of the other five domains, and as a result found that Christopher did not have functional limitations equivalent to a listing. On that basis, the ALJ denied the claim for benefits.

## III.

To establish a disability and receive SSI benefits as a child under Title XVI of the Social Security Act, 42 U.S.C. § 405(g), an applicant must have a "medically determinable physical or mental impairment, which results in marked and severe functional limitations." 42 U.S.C. §

---

[3] In reaching that conclusion, the ALJ did not explain why he found the limitation to be "marked" rather than "extreme." Moreover, in assessing that domain, the ALJ incorrectly stated that Christopher receives special education services only for math and not for other subjects (R. 18). But, Christopher's IEP plan for 2002 in fact showed that Christopher received special education services for all substantive academic subjects covering more than 80 percent of the instructional school week.

6

1382c(a)(3)(C)(i). The specific analysis the SSA must employ to make this determination is described in 20 C.F.R. § 416.924. To determine an applicant's eligibility for SSI, the regulations set forth a three-prong test, each prong of which must be met.

*First*, the child must not be engaged in "substantial gainful activity." 20. C.F.R. § 416.924(b). *Second*, the child's impairments must be "severe." 20 C.F.R. § 416.924(c). *Third*, the child's impairment or impairments must meet the duration requirement and must meet, medically equal, or functionally equal the "listings" of impairments contained in 20 C.F.R. Pt. 404 Subt. P., App. 1., 20 C.F.R. § 416.924(d). In determining functional equivalence to the listings, the SSA considers the child's functioning in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1). If the child is found with either a "marked" limitation in two domains of function or an extreme limitation in one domain, then the child will be found to have a listing level severity of functional limitation and the child will be found to have a disability. As the ALJ correctly noted,

> [t]here is a "marked" limitation in a domain when a child's impairment(s) interferes seriously with the ability to independently initiate, sustain, or complete activities. Day to day functioning may be seriously limited when an impairment(s) limits only one activity or when the interactive and cumulative effects of the child's impairment(s) limit several activities. "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning that would be expected . . . on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

(R. 16, citing 20 C.F.R. § 416.926a).

In making the SSI eligibility determination, the Commissioner must weigh the evidence and make independent factual findings. *Richardson v. Perales*, 402 U.S. 389, 400-01 (1971). When

reviewing an ALJ's decision, a court "may not decide the facts anew . . . or substitute its own judgment for that of the Commissioner." *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999).

Nonetheless, the review is "more than an uncritical rubberstamp." *Schroeder v. Sullivan*, 977 F.2d 391, 394 (7th Cir. 1992) (quoting *Garfield v. Schweiker*, 732 F.2d 605, 610 (7th Cir. 1984)). The reviewing court "must look at the record as a whole, considering evidence that undermines as well as supports the . . . decision." *Id.* With regard to legal interpretations, the court reviews the ALJ's decisions *de novo*. *Dotson v. Shalala*, 1 F.3d 571, 575 (7th Cir. 1993). Findings of fact are affirmed only when they are supported by "substantial evidence." *Allen v. Sullivan*, 977 F.2d 385, 389 (7th Cir. 1992). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

## IV.

The issue presented in this case centers on the ALJ's Step Three determination. The ALJ concluded that Christopher was not disabled at Step Three, because the evidence in the record showed a marked limitation only in the domain of acquiring and using information, but neither marked nor extreme limitations in any other domain. Christopher makes three arguments for reversal and/or remand of the ALJ's decision: (1) the ALJ's conclusion that Christopher has a less than marked limitation in several areas of functional equivalence to the listings is neither supported by substantial evidence nor adequately explained (Pl.'s Mem. at 3-8); (2) when reaching his Step Three finding, the ALJ failed to consider all of the evidence and the overall effects of the combination of impairments that Christopher possesses (Pl.'s Mem. at 8-11); and (3) the ALJ erred in failing to fully develop the record and to consider the case under the listings applicable to visual

impairments (Pl.'s Mem. at 12-14; Pl.'s Reply Mem. at 11-13; Def.'s Mem. at 10-12). For the reasons that follow, the Court concludes that a remand is in order here.

### A.

An ALJ must provide a clear rationale for the decision in light of the evidence. *See Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (holding that the court "cannot uphold a decision by an administrative agency . . . if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result"); *Young v. Secretary of Health and Human Services*, 957 F.2d 386, 403 (7th Cir. 1992); *Guerico v. Shalala*, No. 93 C 323, 1994 WL 66102, at * 2 (N.D. Ill. Mar. 3, 1994) (holding that "[t]he administrative tribunal need not spell out every step in the reasoning, if it provides enough of the steps that the full course [of the decision] may be discerned") (quoting *Brown v. Bowen*, 847 F.2d 342, 346 (7th Cir. 1988)). Although the ALJ need not evaluate in writing every piece of evidence in the record, the ALJ's analysis must be articulated at some minimal level and must state the reasons for accepting or rejecting "entire lines of evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The written decision must provide a "logical bridge from the evidence to [the] conclusion" that allows a reviewing court a "glimpse into the reasoning behind [the] decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 887, 889 (7th Cir. 2001) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)). Specific reasons are required so that the reviewing court can ultimately assess whether the ALJ's determination was supported by substantial evidence or, if not, was "patently wrong." *Id.* (quoting *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000)).

Christopher argues that "the ALJ's conclusion that Christopher has a less than marked limitation in several area[s] of functional equivalence was neither supported by substantial evidence

nor adequately explained" (Pl.'s Mem. at 9). The Court agrees that the ALJ has failed to "build a logical bridge" between the evidence and his conclusion that Christopher has less than marked limitation in certain domains.

Perhaps nowhere is this shortcoming more evident than with respect to the ALJ's analysis of the second domain: attending to and completing tasks (R. 18). The ALJ first defined that domain as addressing "how well a child is able to focus and maintain attention" and "how well a child begins, carries through, and finishes activities, including the pace at which a child performs activities and the ease with which a child can change activities" (R. 18). The ALJ then recited evidence of some of Christopher's limitations in that regard. The ALJ stated that Christopher's teacher reported that he "completes his assignments at a slower pace than other students," and that "he sometimes needs reminders to finish assignments" (R. 18). The ALJ also cited Christopher's testimony that due to his "sub-standard vision," Christopher has "difficulty reading standard size print" that "his eyes get tired after an hour, so he has to rest his eyes for about 30 minutes" (*Id.*). Then, without further explanation or analysis, the ALJ concluded that this evidence "reveals that the claimant has a less than marked limitation in this domain" (*Id.*). This conclusion falls short of the "minimal articulation" standard for at least two reasons.

*First*, the ALJ offers no analysis or explanation as to why these limitations are not "marked." Elsewhere in his decision, the ALJ recognized that a marked limitation exists when a child's impairments interfere "seriously with the ability to independently initiate, sustain or complete activities," and is the equivalent of "the functioning that would be expected to find on standardized testing with scores that are at least two but less than three, standard deviations below the mean" (R. 16). The ALJ failed to explain why the limitations he discussed failed to meet that standard.

*Second*, the ALJ's recitation omitted mention of several important limitations that Christopher apparently suffers, including: (a) Christopher required special education for more than 80 percent of his class time and all of his substantive academic work (R. 264), a factor that under the regulations is a material consideration in analyzing whether limitations in functioning in the second domain are marked (*see* 20 C.F.R. § 416.924a(b)(5), (b)(5)(C), (b)(7), and (b)(7)(iv)); (b) Christopher's IEP plan for 2002 indicated that he could not take tests in the way other children could, but would have to be tested "one concept at a time" (R. 263); and (c) the IEP plan recommended that Christopher's teacher walk by his desk every 15 minutes to make sure that Christopher was engaged in "on task behaviors" (*Id.*). Under the regulations, the large portion of time that Christopher requires in a "structured or supportive setting" like a special educational environment may indicate a severe limitations (20 C.F.R. § 416.914(a)(b)(5)(iv), (c), and should have been considered in light of how Christopher would be able to function outside the structured setting. The ALJ was not entitled to ignore this evidence, which appears plainly relevant to the question of Christopher's ability to attend to and complete tasks. *See Herron*, 19 F.3d at 333 (the ALJ's analysis must state the reasons for accepting or rejecting "entire lines of evidence").

The shortcomings we have identified with respect to the ALJ's discussion of the second domain are repeated elsewhere in his decision. For example, with respect to the fourth domain (which addresses the ability to move about and manipulate objects), the ALJ pointed to evidence that Christopher is blind in his left eye; that, even with correction, he has difficulty seeing small objects with his right eye; and that he has difficulty with activities where binocular vision would be helpful, as well as difficulty with fine motor activities due to his sight limitations (R. 18). Yet, after reciting this evidence of limitations, the ALJ's sole analysis was to state "[c]onsequently, I find the claimant

11

to have a less than marked limitation in this domain" (R. 18). There is no discussion as to why that conclusion "consequently" flows from a recitation of limitations that Christopher plainly possesses. Likewise, with respect to the sixth domain (health and physical well being) the ALJ discussed the lattice degeneration of the right eye and the surgery to "wall off" that condition. The ALJ then stated that Christopher has "less than marked limitation in this domain" (R. 19), without explaining that conclusion or discussing the even more profound condition in Christopher's left eye, though which he has no vision whatsoever.

In her memorandum, the Commissioner attempts to supply the logical bridge that the ALJ has failed to build by reciting evidence that was not discussed or analyzed by the ALJ (*see, e.g.*, Def.'s Mem. at 8). However, it is "the ALJ (not the Commissioner's lawyers) [who] must 'build an accurate and logical bridge from the evidence to her conclusion.'" *Steele v. Barnhardt*, 290 F.3d 936, 941 (7th Cir. 2002) (quoting *Dixon v. Massanari*, 270 F.3d. 1171, 1176 (7th Cir. 2001)). Thus, we decline the Commissioner's invitation to consider the ALJ's determination based on the decision that he did not write, rather than on the one he wrote. *See, e.g., Grove v. Apfel*, 148 F.3d 809, 810 (7th Cir. 1998) ("where the ALJ could go either way based on the evidence, but fails to build a bridge from the evidence to the conclusion and is thus analytically inadequate – in a word unreasoned – we cannot uphold his decision").

**B.**

For the foregoing reasons, the Court concludes that a remand is required. A remand, rather than an order awarding Christopher benefits, is appropriate because, based on our review of the record, we cannot foreclose the possibility that on remand the ALJ might properly find that

Christopher is not disabled. However, that is not a conclusion that this Court can say is supported by substantial evidence based on the ALJ's explanation of his decision.

As a result of the Court's decision to remand the case on the foregoing bases, the Court need not address all of the other arguments raised by the claimant in support of reversal of the ALJ's decision. However, we do address two points that we believe the ALJ should consider on remand.

*First*, the ALJ's finding with respect to the domain of acquiring and using information – a domain in which the ALJ concluded that Christopher has a marked limitation – contains a significant factual error. The ALJ stated that Christopher received special education services only for math and not for other subjects (R. 18). This statement is inconsistent both with Christopher's testimony, which the ALJ found credible (R. 19, Finding No. 11), that he is a regular full-time special education student (R. 32), and with the terms of the Christopher's IEP plan for 2002, which indicates that more than 80 percent of his class time, and all of his class time in substantive academic subjects, are in special education classes (R. 264). Correction of this factual error could lead the ALJ to conclude that Christopher's extensive need for special education classes, in combination with the other limitations described by the ALJ in Christopher's ability to acquire and use information, means that Christopher's limitation in this domain is extreme rather than marked. If so, that would lead to a finding of disability, whatever the nature of Christopher's limitations with respect to the other five domains. This factual error is a material one that could affect the outcome of the decision, *see Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989), and so the ALJ must correct the error and consider the impact of the corrected information on his conclusion with respect to the first domain.

*Second*, we note that there is a paucity of current medical evidence concerning the extent and nature of Christopher's limitations in sight in his right eye. There is an April 2002 record that

indicates that Christopher's corrected vision in his right eye is 20/30 (R. 255). However, there is no medical analysis in the record concerning the extent of limitation in Christopher's peripheral vision in his right eye, or concerning the pain that the lattice condition in his right eye would cause, or about the efficacy of the July 2001 surgery to "wall off" that degenerative condition. Current medical evidence is important in assessing a disability claim, and is required by both the case law and regulations. *See, e.g., Hickman v. Apfel*, 187 F.3d 683, 688 (7th Cir. 1999) (discussing C.F.R. § 416.926(b)); *see also Kendrick v. Shalala*, 998 F.2d 455, 456-57 (7th Cir. 1993) (the record is considered complete when there is enough evidence for the ALJ to make a fully informed decision). On remand, the ALJ should take steps to insure that there is current medical evidence of the extent of any limitations that Christopher may have with respect to the vision in his right eye.[4]

## CONCLUSION

For the reasons set forth above, the plaintiff's motion for summary judgment is GRANTED (doc. # 17) and the defendant's motion for summary judgment (doc. # 23) is DENIED. This case is remanded, pursuant to sentence 4, 42 U.S.C. § 405(g), for further administrative proceedings consistent with this opinion.

ENTER:

/s/ Sidney I. Schenkier

SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated: January 26, 2004

---

[4] We note that the duty to marshal substantial evidence for the Commissioner's decision belongs, at the threshold, to the ALJ. "It is a basic obligation of the ALJ to develop a full and fair record." *Thompson v. Sullivan*, 933 F.2d 581, 585 (7th Cir. 1991) (quoting *Smith v. Secretary of Health, Education and Welfare*, 587 F.2d 857, 860 (7th Cir. 1978)).